**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**


COUNTY SCHOOL BOARD OF
HENRICO COUNTY, VIRGINIA

     Plaintiff,

v.                                  Civil Action No. 3:04cv923

RT, a minor, <u>et al.</u>,

     Defendants.


**MEMORANDUM OPINION**

     The County School Board of Henrico County, Virginia ("School Board") instituted this action against RT, a minor with disabilities, and his parents, RCT and CMT, challenging a State Hearing Officer's decision, made under the Individuals With Disabilities Education Act ("IDEA"),[1] and applicable State law,[2] in favor of the parents as to the appropriate educational placement for RT.  The parents and RT (hereafter "the parents") filed a counterclaim.  Now before the Court are the parents' MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM COUNTS I AND II (Docket No. 28)

---

[1]  20 U.S.C. § 1400 <u>et</u>. <u>seq</u>. (2000)(hereafter all citations to the IDEA are from the 2000 ed. of the U.S.C.).

[2]  <u>See</u> Va. Code Ann. § 22.1-214 (2003 ed.) (hereinafter all citations to Va. Code Ann. are to the 2003 edition); 8 Va. Admin. Code 20-80-76(E)(3) (2005) (hereinafter "VAC"); 8 VAC 20-80-76(O)(3).

and the School Board's SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT
(Docket No. 14).

## BACKGROUND FACTS

RT was born in 1998 and suffers from autism.  It is undisputed
that RT is a child with disabilities who is eligible for services
under the IDEA and applicable state law.  Among those services is
the right to receive a "free appropriate public education" ("FAPE")
pursuant to an individualized educational plan ("IEP") that is
agreed upon by the parents and the State or the local education
authority ("LEA"), and that prescribes the appropriate educational
placement of the student.   § 1412(a)(1)(A);  § 1412(a)(4);  §
1414(d).[3]

RT received educational services at home from 1999 to the fall
of 2001 through various county supported home-based programs.  In
the fall of 2001, RT began attending the Pre-School Education For
Developmentally Delayed ("PEDD") program at Maybeury Elementary

_____

[3] The facts are set forth fully in a Memorandum Opinion issued
on May 26, 2006 (Docket No. 95) which resolved the merits of the
case in favor of the parents.
    By an Order issued on April 4, 2006 (Docket No 91), the Court
asked the parties to assess whether a decision on the merits of the
State Hearing Officer's decision would render moot the cross-
motions for summary judgment.   In their responsive briefing
(Dockets Nos. 92,93,94), both parties agreed, albeit for different
reasons, that such a decision would not render the cross-motions
moot.  Indeed, a decision on either the merits or on these cross
motions would not render the decision on the other phase moot.
This is because the merits opinion and cross-motions both require
a decision on the availability of relief for a time period not
covered by the other phase and of the basis for and the kind of
available relief.

School.  In September 2002, RT moved to Twin Hickory Elementary School under an interim IEP.  Concerned by RT's lack of progress under past IEP's offered by the School Board and aware that a critical window of developmental opportunity was closing for RT,[4] the parents began to investigate other alternatives to those being proposed by the School Board for the 2002-2003 school year.

In late October 2002, the School Board proposed an IEP that placed RT at Twin Hickory Elementary School for the full school year.  That IEP was finalized on November 4, 2002 ("November IEP").  After reviewing RT's progress under the past IEP's and after consulting outside educational experts, RT's parents concluded that the proposed Twin Hickory placement was not appropriate and that placement at the Faison School, a private school that specializes in the education of autistic children, would provide RT with the appropriate educational placement.  The School Board summarily declined the parents' proposal that RT be placed at the Faison School, contending instead that RT's progress to date was sufficient and that the November IEP, which maintained many of the same goals as the previous IEP but moved RT to the so-called "TEACCH" program at Twin Hickory, satisfied the School Board's legal obligations.

---

[4] Expert testimony given at RT's state administrative due process hearing established that, if an autistic child does not learn to speak by the age of seven or eight, the chances of ever becoming verbal are greatly reduced.

On December 3, 2002, after being unable to resolve the dispute over the appropriate placement for RT, and after giving the School Board the requisite notice, RT's parents placed him in the Faison School.  On June 10, 2003, pursuant to the IDEA and State law, the parents formally requested an administrative hearing to resolve the dispute.  See § 1415(f)(1).  The State Hearing Officer conducted a three-day administrative hearing in August 2003.

On December 29, 2003,[5] the State Hearing Officer ruled in favor of the parents, holding that, under the IDEA and governing case law, the IEP proposed by the School Board was inappropriate and that the Faison School placement provided the statutorily required appropriate educational benefits.  (State Hearing Officer's Decision at 32-34, attached to Complaint as Exhibit A.)[6] Acting under the IDEA and applicable State law,[7] the State Hearing Officer "ORDERED that the parents . . . [and RT] are entitled to reimbursement of tuition costs and related expenses at the Faison School and the [parents] are the prevailing parties."  Id. at 34. The decision was final and binding upon the parties, but judicial

---

[5] The applicable regulations require the hearing officer to decide the case within 45 days of the parent's request for the hearing, 8 VAC 20-80-76(L)(1).  However, for reasons not pertinent here, the decision was delayed.

[6] Hereinafter referred to as the "State Hearing Officer's Decision."

[7] 8 VAC 20-80-76(E)(1),(O)(3).

review could be sought within a year of the decision.  See §
1415(i).

On December 17, 2004, with the one-year period for seeking
judicial review coming to a close, the School Board filed its
Complaint in this Court seeking review of the State Hearing
Officer's decision.  Counsel for the School Board attributed the
delay in filing solely to the fact that counsel had other
professional commitments.  To date, the School Board has not
complied with the State Hearing Officer's order of reimbursement.

## STATUTORY AND REGULATORY FRAMEWORK

The IDEA makes federal assistance available to States for a
fiscal year if, in that year, the State assures "the Secretary of
Education that the State has in effect policies and procedures to
ensure that the State meets" the conditions imposed by the IDEA.
§ 1412(a).  In so doing, the receiving State must certify that "[a]
free appropriate education is available to all children with
disabilities residing in the State between the ages of 3 and 21,
inclusive. . .."  § 1412(a)(1)(A).

The IDEA defines the term "free appropriate public education"
to mean "special education and related services that - (A) have
been provided at public expense, under public supervision, and
without charge."  § 1401(8).  The term "special education" means
"specially designed instruction, at no cost to parents. . . to meet
the unique needs of a handicapped child . . . ."  § 1401(25)

5

(emphasis added).   The term "related services" is defined as "transportation, and such developmental supportive services . . . as may be required to assist a handicapped child to benefit from special education." § 1401(22).

The Supreme Court has held that the term "free appropriate public education" does not require the school district to provide the disabled child with the best education possible.  Bd. of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 203 (1982). The State meets its obligations if it provide a qualifying child with:

> personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP.

Id. (emphasis added).  This reflects "congressional intent . . . [inter alia] to require the States [that accept federal funds] to adopt procedures which would result in individualized consideration of and instruction for each [disabled] child."   Id. at 190 (emphasis in original).

If they meet the IDEA's requirements, children "placed in, or referred to" private schools by the State or the LEA are specifically included within the statute's protections.   §

6

1412(a)(10)(B)(i); see also § 1412(a)(10)(A)(i).[8]   Under those
circumstances, the private schooling must be at public expense.  §
1412(a)(10(B)(i).[9]

If there is disagreement about the appropriate placement of
the child, the IDEA requires resolution of the dispute in an
administrative proceeding that is subject to judicial review.  §
1415(i)(2).[10]   In Virginia, to resolve disputes over the proper

---

[8] That section reads:

To the extent consistent with the number and location of
children with disabilities in the State who are enrolled
by their parents in private elementary schools and
secondary schools in the school district served by a
local educational agency, provision is made for the
participation of those children in the program assisted
or carried out under this subchapter by providing for
such children special education and related services...

§ 1412(a)(10)(A)(i).

[9] That section reads:

Children with disabilities in private schools and
facilities are provided special education and related
services, in accordance with an individualized education
program, at no cost to their parents, if such children
are placed in, or referred to, such schools or facilities
by the State or appropriate local educational agency as
the means of carrying out the requirements of this
subchapter or any other applicable law requiring the
provision of special education and related services to
all children with disabilities within such State.

§ 1412(a)(10)(B)(i).

[10] This is but one of several procedural protections that the
IDEA requires to accomplish its purposes and to assure that
placement is not the unilateral decision of the government.  See
§ 1415(a)-(m).

placement of a disabled child, a hearing officer appointed by the State conducts an administrative hearing and then makes findings of fact and conclusions of law.  See generally § 1415(f)-(i)(1); Va. Code Ann. § 22.1-214; 8 VAC § 20-80-76.

If the hearing officer determines that the LEA has provided the child with a FAPE through the proposed IEP, the parents bear the cost of the private placement.  § 1412(a)(10)(C)(i).[11] Conversely, the IDEA specifically empowers hearing officers and the state and federal courts to order the school district to reimburse the parents following a determination that the child has not been afforded a FAPE in a timely manner.  § 1412(a)(10)(C)(ii).[12]  No

---

[11] That section provides:

> Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility <u>if</u> that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

§ 1412(a)(10)(C)(i) (emphasis added).

[12] The statute reads:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, <u>a court or a hearing officer may require the agency to reimburse</u> the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

§ 1412(a)(10)(C)(ii) (emphasis added).

matter what the outcome of the State administrative hearing, the IDEA provides that the decision of a hearing officer "shall be final," except that a party to the proceeding may bring an action in the appropriate State court or federal district court to challenge a hearing officer's decision.  § 1415(i)(1),(2)(A).

### THE POSITIONS OF THE PARTIES

#### A.    The Complaint And The Counterclaim

The School Board's Complaint is laden with factual details and reads more like a brief than a complaint.  In the Conclusion section, the Complaint asserts that the IEP offered an appropriate education for RT and, therefore, that the parents are not entitled to reimbursement for the cost of the Faison School for the 2002-2003 school year.  By way of relief, the School Board asks that the State Hearing Officer's decision be reversed and that final judgment be entered for the School Board.

The parents' Answer is also like a brief because it responds in kind to the detailed factual assertions and legal arguments made in the Complaint.  At bottom, the parents deny that the administrative decision limited the required reimbursement to the 2002-03 school year, contending instead that it imposed a continuing obligation for the School Board to reimburse them for the cost of educating RT at the Faison School before the State

Hearing Officer's decision and thereafter.[13]   They also seek attorney's fees and costs.

The parents also filed a two-count Counterclaim seeking relief under the IDEA and, alternatively, under State law.  Under both counts of their Counterclaim, the parents pray for entry of an order requiring the School Board immediately to pay for the cost of the Faison placement for the 2003-2004 and 2004-2005 school year and for the "immediate reimbursement" of costs at the Faison school "for future years until such time as the Faison School ceases to be RT's 'current educational placement.'" (Def.'s Countercl. 10 (quoting § 1415(j)).)

The parents and the School Board disagree over whether, either under the IDEA or State law, the School Board is required to pay the cost of educating RT at the Faison School immediately upon entry of the State Hearing Officer's order requiring such payments and continuing until the final resolution of the litigation.  The parties, adopting the vernacular of the case law, refer to this as the "<u>pendente</u> <u>lite</u> payment obligation."

The parties agreed to resolve that purely legal question through cross-motions for summary judgment.[14]   To that end, the

---

[13]   The School Board and the parents agreed on a new IEP, effective March 20, 2006, which will provide RT schooling at public expense.  Letter of William Hurd, March 21, 2006, at 1 (Case File 4, left side).

[14] In a settlement conference conducted by a Magistrate Judge on May 16, 2005, the parties agreed that resolution of the entire

School Board filed its Second Motion For Partial Summary Judgment and, in turn, the parents replied with their own Motion For Summary Judgment On Counterclaim Counts I and II.   The summary judgment motions address only the pendente lite payment obligation.

**B.   Cross-Motions For Summary Judgment**

The cross-motions for summary judgment are directed to 20 U.S.C. § 1415(j), which reads in pertinent part:

> [D]uring the pendency of any proceeding conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . .

Id.   Initially, the summary judgment motions also implicated a regulation promulgated by the DOE in implementing the IDEA.   That regulation provides that:

> (a) Except as provided in § 300.526, during the pendency of any administrative or judicial proceeding regarding a complaint under § 300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.
>
>                    *  *  *
>
> (c) If the decision of a hearing officer in a due process hearing conducted by the SEA or a

_____

case would be more readily achieved if the issues of the pendente lite obligation was resolved first.   Therefore, the Court agreed to a schedule for the resolution of that issue on summary judgment.
      Unfortunately, that procedure resulted in delay, rather than expediting the resolution of the case because of the need to allow the United States to defend against the School Board's attack on the federal regulation.

> State review official in an administrative
> appeal agrees with the child's parents that a
> change of placement is appropriate, that
> placement must be treated as an agreement
> between the State or local agency and the
> parents for purposes of paragraph (a) of this
> section.

34 C.F.R. §§ 300.514(a),(c).

As filed originally, the School Board's Motion For Partial Summary Judgment was directed largely to 34 C.F.R. § 300.514(c). The motion now is addressed principally to the statute.

## DISCUSSION

As briefing has progressed, the School Board's arguments have become focused on whether the statute violates the Spending Clause. Hence, it is appropriate first to discuss the School Board's position respecting the IDEA and the Spending Clause.

## I.   The Spending Clause Argument

### A. Spending Clause Principles

The Spending Clause of the United States Constitution gives Congress the power to "provide for the common Defense and general Welfare of the United States." U.S. CONST. Art I Sec. 8. "General Welfare" has been construed broadly. See, e.g., South Dakota v. Dole, 483 U.S. 206, 207 (1987)("In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress."). The Spending Clause itself minimally restricts congressional spending

12

power.   However, in <u>Pennhurst State Sch. and Hosp. v. Halderman</u>, 451 U.S. 1 (1981), and subsequent decisions,[15] the Supreme Court set boundaries on congressional Spending Clause power in a manner consistent with the federal structure[16] of government established by the Constitution and the Tenth Amendment.   In <u>Pennhurst</u>, the Supreme Court explained that:

> legislation enacted pursuant to the spending power is <u>much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions</u>.  The <u>legitimacy of Congress's power</u> to legislate under the spending power thus <u>rests on whether the State voluntarily and knowingly accepts the terms of the "contract."</u> [citations omitted] . . . <u>[I]f Congress intends to impose a condition</u> on the grant of federal moneys, it <u>must do so unambiguously</u>. . . By insisting that Congress speak with a clear voice, we <u>enable the States to exercise their choice knowingly, cognizant of the consequences</u> of their participation.

---

[15] <u>See,</u> <u>e.g.,</u> <u>Dole</u>, 483 U.S. at 207-08.

[16] One commentator has identified five federalism-related purposes of the <u>Pennhurst</u> rule.  They are:

> (1) protecting state autonomy and maximizing state voluntary choice; (2) limiting Congress's authority to accomplish indirectly what it could not accomplish directly through exercise of its affirmative legislative powers; (3) promoting transparency in legislation and increasing the chance that Congress considers the interests of the states when it imposes burdens on them; (4)ensuring the state compliance with obligations fairly imposed by federal law; and (5) enabling Congress to address problems of national importance through its chosen means.

Peter J. Smith, <u>Pennhurst, Chevron, and the Spending Power</u>, 110 Yale L.J. 1187, 1199 (2001).

Id. at 17 (emphasis added) (citations omitted).  This language from Pennhurst articulated what is now known as the "contract theory" of the Spending Clause.  By ensuring that "States exercise their choice knowingly, cognizant of the consequences of their participation," the Supreme Court required that Congress make the terms of a spending clause statute clear so that States are on notice of the obligations that accompany their receipt of the federal funding.  Absent this notice, federal imposition of a condition of federal funding violates the Spending Clause. Pennhurst, 451 U.S. at 17 ("there can be no knowing acceptance of the terms of the contract if a State is unaware of the conditions imposed by the legislation on its receipt of funds.") (emphasis added).[17]  Courts have been particularly vigilant in maintaining the proper federal-state balance where a federal spending clause statute imposes conditions on core state functions, such as education, which historically have been reserved to the States through our constitutional structure.  E.g. Virginia v. Riley, 106

---

[17] Accord Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 183 (2005) (holding that funding recipients were on notice that Title IX encompasses liability for diverse forms of intentional sex discrimination); Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 640 (1999) ("Because we have repeatedly treated Title IX as legislation enacted pursuant to . . . the Spending Clause, . . . private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." [internal citations omitted]); Barnes v. Gorman, 536 U.S. 181, 187 (2002) ("a remedy is "appropriate relief" only if the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature.") (internal citations omitted).

14

F.3d 559, 566 (4th Cir. 1997)(education is "one of, if not the most significant of, the powers or functions reserved to the States by the Tenth Amendment" and collecting cases supporting that proposition).

### B. The Spending Clause Arguments

The School Board's Spending Clause argument is essentially that "Section 1415(j) does not contain plain and unambiguous language requiring school divisions to fund a unilateral private placement when a hearing officer has found in favor of the parents and the matter is under review by a state or federal court. Nor does any other IDEA provision." (Second Mot. For Part'l Summ. J. at 16.); see Riley, 106 F.3d at 566-67. The School Board does not argue that Congress lacks the power under the Spending Clause to require pendente lite relief. Rather, the School Board argues only that the IDEA currently does not require pendente lite payments.[18]

The parents argue that the School Board is not a proper party to present a Spending Clause challenge to the IDEA. Alternatively, the parents contend that, if the School Board is a proper party, reading the IDEA to require pendente lite payments does not violate the Spending Clause. The United States, as amicus curiae, does not

_____

[18] Initially, the School Board argued that the regulation found at 34 C.F.R. § 300.514(c) violated the Spending Clause. The parties briefed that issue but because the Spending Clause relates to congressional power, not executive power, the School Board's Spending Clause attack shifted to the IDEA as briefing progressed.

15

make the "proper party" argument, but supports the parents'
substantive argument as to the constitutionality of the IDEA.

For the following reasons, the School Board's Spending Clause
argument is rejected, the School Board's motion for summary
judgment is denied, and the parents' motion for summary judgment on
their counterclaims is granted.

## II.  Proper Party

At the hearing on these motions, the question arose as to
whether the School Board is a proper party to bring a Spending
Clause challenge to the IDEA.  Thereafter, the issue was briefed.

In support of the contention that it is entitled to raise a
Spending Clause challenge, the School Board argues that both the
Fourth Circuit and the Seventh Circuit have adjudicated cases
brought by LEAs challenging provisions in the IDEA even though the
State had not also challenged the statute.  See Sellers v. Schl.
Bd. of Manassas, 141 F.3d 524 (4th Cir. 1998); Doe v. Bd. of Educ.
of Oak Park, 115 F.3d 1273 (7th Cir. 1997) cert. denied 522 U.S.
998 (1997).  The School Board's argument correctly states what
happened in Doe and Sellers, but the argument is unavailing because
the issue raised by the parents here was neither presented nor
addressed in Sellers, Doe, or similar cases.

It also is true that the Supreme Court and the Courts of
Appeals have decided several cases wherein local entities have
challenged, under the Spending Clause, the interpretation of other

16

statutes that were enacted pursuant to the Spending Clause.  E.g.
Jackson, 544 U.S. 167 (Title IX); Barnes, 536 U.S. 181 (suit
against Kansas City Police Department under the Americans with
Disabilities Act and Rehabilitation Act); Sellers, 141 F.3d 524
(IDEA).  However, none of those decisions addressed the issue  of
whether a local entity has a right under the Spending Clause to
challenge a statutory contract made between the State and the
federal government, and certainly not a contract made pursuant to
the IDEA.  Here, the State not only does not challenge the statute
or its contract under the IDEA but, indeed, has enacted regulations
requiring both it and its LEAs to perform the very obligation that
one of its LEAs now challenges.  Under these circumstances, the
School Board's argument that several cases have been brought by
local entities raising challenges under the Spending Clause does
not resolve the issue presented by the parents.

The parents argue that, under the contract theory of the
Spending Clause, the structure of the IDEA makes Virginia and the
federal government the contracting parties.  The parents contend
that the School Board is not a party to the contract, and may
assert a right to challenge the contract only if the School Board
has third-party standing to assert the rights of the State.

In response, the School Board argues that it satisfies the
requirements of standing doctrine because it has a "direct,
concrete and particularized interest in the Court's resolution of

the Spending Clause defenses to the claims of the parents." (School Board's Brief Regarding Spending Clause Issues at 4); see Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (stating the requirements to establish constitutional standing). For that reason, says the School Board, it has standing to challenge the statute.[19]

Neither party has cited a decision applying the general principles of standing, constitutional or prudential, to the assertion of a constitutional provision as a basis for, or as a defense to, summary judgment. And, it appears that traditional standing jurisprudence does not provide the proper framework for analyzing whether the School Board can present a Spending Clause challenge to the IDEA in the summary judgment context. See Rakas v. Illinois, 439 U.S. 128, 138 (1979) (traditional standing principles do not provide the method for assessing whether a

---

[19] The parents also argued that, by failing to file a relevant comment during the notice and comment period for 34 C.F.R. § 300.514(c), the School Board waived its right to challenge that regulation. To support their waiver argument, the parents quote the Fourth Circuit for the proposition that "[i]t is well established that issues not raised in comments before the agency are waived and this Court will not consider them." Nat'l Wildlife Fed'n v. EPA, 286 F.3d 554, 562 (4th Cir. 2002) citing Nat'l Elec. Mfrs. Ass'n v. EPA, 99 F.3d 1170, 1171 n. 1 (D.C. Cir. 1997) and Washington Ass'n for Television & Children v FCC, 712 F.2d 677, 681 (D.D. Cir. 1983). The record does not reflect whether the School Board made a Spending Clause-based argument during the rule making proceedings that led to the promulgation of 34 C.F.R. § 300.514(c). However, as explained above, because the School Board's Spending Clause argument has become focused on the statute, not its implementing regulation, the parents' waiver argument is irrelevant to the School Board's Spending Clause challenge.

defendant is entitled to raise a Fourth Amendment challenge to a search).  Hence, the traditional standing arguments presented by the parties need not be further considered.

The parents' argument, although cast in terms of standing, is actually more in the nature of a theory of estoppel.  To assess that theory, it is appropriate to reflect upon the Spending Cause contract as effectuated by the IDEA.  Pennhurst, 451 U.S. at 17.

The IDEA provides grants to eligible states, § 1411(a)(1) et. seq., if the "State demonstrates to the satisfaction of the Secretary that the State has in effect policies and procedures to ensure" that it meets the enumerated obligations of the IDEA, as set forth in section 1412.  § 1412(a) et. seq..  An LEA is eligible to receive grants from the state if the LEA "demonstrates to the satisfaction of the state educational agency that it meets each of the" enumerated conditions set forth in section 1413.  § 1413(a) et seq..  Thus, funding flows from the federal government to the State based on the States' assurances to the federal government, and from the State to the LEA based upon the LEA's assurances to the State. But, the State is not entitled to receive federal funds unless it first has the necessary assurances from the LEA.  §§ 1412(a), 1413(a).

Virginia has enacted laws and regulations implementing the IDEA and, in each year that is relevant to this case, Virginia has submitted its program to the Secretary of Education for review and

19

approval.  It is uncontested that the Secretary approved Virginia's program for each of the years concerning the events in this action, and that, as a consequence, federal funds have come to the State and then to the School Board.  Well before the events in this case, Virginia enacted regulations implementing the IDEA.[20]  In particular, 8 VAC 20-80-76(E)(1) and (3) read:

> (1)[D]uring the pendency of any administrative or judicial proceeding, the child must remain in the current educational placement unless the parent or parents of the child and local educational agency agree otherwise[.]

> (3)If the decision of a hearing officer agrees with the child's parent or parents that a change of placement is appropriate, that placement <u>shall be treated as an agreement</u> between the local educational agency and the parent or parents for the purposes of maintaining the child's placement during the pendency of any administrative or judicial appeal proceeding[.]

<u>Id.</u> (emphasis added).  8 VAC 20-80-76(O)(3) reads:

> If the hearing officer's decision is appealed in court, implementation of the hearing officer's order is held in abeyance <u>except in those cases where the hearing officer has agreed with the child's parent or parents</u> that a change in placement is appropriate in accordance with subsection E of this section. <u>In those cases, the hearing officer's order must be implemented while the case is being appealed</u>.

---

[20] 8 VAC 20-80-76(E)(3) was enacted January 17, 2000.

20

Id. (emphasis added).  Virginia's regulations thus provide that pendente lite payments must be made by the LEA when it appeals a hearing officer's decision in the parents' favor.[21]

Virginia's regulations, including the Virginia pendente lite payment rule, are part and parcel of the arrangement between Virginia and the federal government by which IDEA funding is made available to Virginia to pass along to LEA's such as the School Board.  And, as a condition of its receipt of those federal funds, the School Board has assured Virginia that it will adhere to the IDEA and the applicable federal and state regulations.[22]

The School Board's current challenge to the IDEA on Spending Clause grounds must be considered against its repeated assurances to Virginia, and thereby to the federal government, that it would comply with the IDEA and related regulations, and the School

---

[21] The implications these regulations have on the parents' state law claim are discussed in Part VI.B, infra.

[22] See Letter of Judith Hurmann, Assistant Secretary of the United States Department of Education, to Dr. Jo Lynne DeMary, Acting Superintendent, Virginia Department of Education, March 27, 2000 (Attached as Exh. 3 to Mem. in Support of Countercl. Pl's Mot. For Summ. J. on Countercl. I and II.) (hereinafter "Secretary Hurmann Letter") ("In order to receive [IDEA] grant[s], VDOE assured that '. . . throughout the period of the grant award, all public agencies in the State will comply with all of the requirements of Parts A and B of the IDEA, as amended by the IDEA Amendments of 1997 . . .'"); Letter of John H. Hager, Assistant Secretary, U.S. Department of Education, to Jo Lynn DeMary, Superintendent of Public Instruction, Virginia Department of Education, Aug. 29, 2005 (Attached as exh. 2 to Br. of United States as amicus curiae in Resp. to Schl. Bd.'s 2d Mot. for Part'l Summ. J.) (hereinafter Hager Letter).

Board's repeated acceptance of IDEA funding. Viewed in that perspective, the case calls for the application of the doctrine of quasi-estoppel.[23] As the Fifth Circuit has explained:

> Quasi estoppel "was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position." Stimpson v. Plano Indep. School Dist., 743 S.W.2d 944, 946 (Tex. App.-Dallas 1987, writ denied). "Quasi-estoppel differs from equitable estoppel or estoppel in pais in that quasi-estoppel requires no concealment or misrepresentation of existing facts on the one side, and no ignorance or reliance on the other." Arrington v. County of Dallas, 792 S.W.2d 468, 472 (Tex. App.-Dallas 1990, writ denied).

Neiman-Marcus Group, Inc. v. Dworkin, 919 F.2d 368, 371 (5th Cir. 1990). The Supreme Court and the Fourth Circuit have long recognized the doctrine of quasi-estoppel. E.g. Simmons v. Burlington, Cedar Rapids & Northern Ry. Co., 159 U.S. 278, 290 (1895); Ritter v. Ulman, 78 F. 222, 224 (4th Cir. 1897). In Ritter, the Court of Appeals explained:

> In order to constitute estoppel, or quasi estoppel, by acquiescence, the party, with full knowledge or notice of his rights, must freely do what amounts to a recognition of the

---

[23] "It is called estoppel, because a man's own act or acceptance stoppeth or closeth his mouth to allege or plead the truth." Scott County, Arkansas v. Advance-Rumley Thresher Co., 288 F. 739, 751 (8th Cir. 1923).

> transaction, or must act in a manner inconsistent with its repudiation, or must lie by for a considerable time, and knowingly permit the other party to deal with the subject-matter under the belief that the transaction has been recognized, or must abstain for a considerable time from impeaching it, so that the other party may reasonably suppose that it is recognized.

Id. at 224.

In general, modern courts have held that quasi-estoppel applies when the offending party takes a different position than his or her original position, and, either the offending party gains an advantage or causes a disadvantage to the other party; the other party is induced to change positions; or, it would be unconscionable to permit the offending party to maintain an inconsistent position from which it has already derived a benefit or in which it has acquiesced. See, e.g., Atwood v. Smith, - - P.3d - - (Idaho 2006), WL 1420821, * 3 (not yet released for official publication). As compared to equitable estoppel, quasi-estoppel does not require a showing of detrimental reliance. Instead, there must only be evidence that it would be unconscionable to permit the offending party to assert the allegedly contrary positions.[24]

---

[24] See In re Dow Corning Corp., 419 F.3d 543, 554 (6th Cir. 2004); Erie Telecomm., Inc. v. City of Erie, 659 F. Supp. 580, 585 (W.D.Pa. 1987); Haglund v. Philip Morris, 847 N.W.2d 315, 327 (Mass. 2006); Whiteacre Partnership v. Biosignia, Inc., 591 S.E.2d 870, 881-82 (N.C. 2004); Thomas v. Arkoosh Produce, Inc., 48 P.3d 1241, 1246 (Idaho 2002); Lopez v. Muñoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 864 (Tex. 2000); Dressel v. Weeks, 779 P.2d 324, 329

The record in this action shows that the School Board not only had ample notice of its _pendente_ _lite_ obligations under the IDEA and related State law, but that it long has acquiesced in those requirements. As explained previously, Virginia law requires LEAs to make _pendente_ _lite_ payments. _See_, _supra_, 8 VAC 20-80-76(O)(3) (emphasis added).[25] That regulation was enacted on January 1, 2001. The School Board also knew, at least by 1999, when the Department of Education promulgated 34 C.F.R. 300.514(c), that several courts of appeals had held that the IDEA required _pendente_ _lite_ payments. _See_, _infra_, Part IV (discussing relevant court of appeals decisions).[26]

_____

(Alaska 1989); Combridge State Bank v. James, 480 N.W.2d 647, 650-51 (Minn. 1992) (applying acceptance-of-benefits estoppel to party challenging constitutionality of statute by which the party had accepted a tax benefit); Unruh v. Industrial Commission, 301 P.2d 1029, 1031 (Ariz. 1956); Hensgen v. Silberman, 197 P.2d 356, 357-58 (Cal. App. 2d 1948); Montclair Trust Co. v. Russell Co., 39 A.2d 641, 643 (N.J. Ch. 1944); Headlee v. Cain, 250 S.E.2d 611, 614 (Mo. Ct. App. 1923); see generally 31 C.J.S. Estoppel and Waiver § 120.

[25] There is no federal counterpart to 8 VAC 80-20-76(O)(3). In substance, this State regulation says explicitly what 34 C.F.R. § 300.514(c) implicitly requires. _See_ Comment to 34 C.F.R. § 300.514(c) located in Attachment 1 to "Assistance to States for the Education of Children With Disabilities and the Early Intervention Program for Infants and Toddlers With Disabilities," 64 Fed. Reg. 12406, 12615 (March 12, 1999) (Sec. 300.514(c) "shifts responsibility for maintaining the parents' proposed placement to the public agency while an appeal is pending in those instances where" the hearing officer "determines the parents' proposed change of placement is appropriate.")

[26] The Comment to 34 C.F.R. § 300.514(c) states that the regulation "is based on long-standing judicial interpretation of the Act's pendency provision . . ." and cites Burlington Schl.

Since 1999, and for the years involved in this action, the School Board accepted federal funding pursuant to the IDEA, and, when doing so, the School Board understood its <u>pendente</u> <u>lite</u> obligations – obligations which, as discussed below, are clear and unambiguous.  Likewise, for each year in question here, the School Board assured the State, which in turn assured the United States, that it would comply with the terms of the IDEA and relevant State law, including the requirement that the School Board make <u>pendente</u> <u>lite</u> payments during the judicial review of a hearing officer's decision in favor of the parents.

Thus, the School Board has obtained an advantage (significant federal funding) as a result of its original position (its agreement to comply with the terms of the IDEA and related regulations).[27]  And, the School Board annually obtained this advantage after it was well-aware of its <u>pendente</u> <u>lite</u> obligations.[28]  The inconsistency between the School Board's original and current position could not be greater because the two positions are diametrically opposed; and, the School Board is well

---

Comm. v. Dept. of Educ., 471 U.S. 359, 371 (1985); <u>Susquenita Schl.</u> <u>Dist. v. Reaelee S.</u>, 96 F.3d 78, 84 (3d Cir. 1996); <u>Clovis Unified</u> <u>Schl. v. Office of Admin. Hearings</u>, 903 F.2d 635, 641 (9th Cir. 1990).   <u>Supra</u>, note 25, 64 Fed. Reg. at 12615.

[27] See cases cited, <u>supra</u>, note 24.

[28] Current 20 U.S.C. § 1415(j) appeared at § 1415(e)(3) in the Education of the Handicapped Act of 1976, the predecessor of the IDEA.  34 C.F.R. 300.514(c) was promulgated in 1999 and 8 VAC 80-20-76(E)(3) and (O)(3) was enacted in January 2001.

aware of that fact.  See Dressel, 779 F.2d at 329 n.4. (magnitude as factor of quasi-estoppel).

Having agreed to comply with the IDEA, its federal regulations, and the parallel State regulations, and having accepted and spent federal IDEA funding, the School Board cannot now avoid the obligations to which it previously agreed by arguing now that the IDEA is an invalid exercise of the Spending Clause. See Jackson, 544 U.S. at 183-84 (holding that in the face of the statute, extant case law, and federal regulations that all provided Spending Clause notice, "[t]he Board could not have realistically supposed that, given this context, it remained free" to violate Title IX (enacted pursuant to the Spending Clause)); see cases cited, supra, n. 24; see generally 31 C.J.S. Estoppel and Waiver § 125.[29]  Indeed, to allow that would be unconscionable.  That conclusion is supported by the longstanding maxim that "it would offend every principle of equity and good morals to permit [a party to a transaction] to enjoy its benefits and at the same time deny

---

[29] Courts from numerous jurisdictions have held that estoppel acts to prevent injustice where it would be unconscionable to permit a party to maintain a position inconsistent with one in which it has accepted benefits and/or acquiesced. Albert v. Joralemon, 271 F.2d 236, 241 (9th Cir. 1959); General Elec. Co., v. Sciaky Bros., Inc., 187 F. Supp. 667, 674 (E.D. Mich 1960); Dressel, 779 P.2d at 329; Koop v. City of Omaha, 114 N.W.2d 380 (Neb. 1962); San Manuel Copper Corp. v. Farrell, 362 P.2d 730, 731 (Ariz. 1961); Holmes v. Graves, 318 P.2d 354, 356 (Ariz. 1957); Burford v. Mochy, 29 S.E. 2d 729 (N.C. 1944); De Boe v. Prentice Packing & Storage Co., 20 P.2d 1107, 1110 (Wash. 1933) Lillard v. Bd. of County Com'rs of Johnson County, 172 P. 518, 518 (Kan. 1918); Ritter, 78 F. at 224.

its terms and qualifications." <u>Thompson v. Soles</u>, 257 S.E.2d 59,
62 (N.C. Ct. App. 1979)(quoting <u>Fort v. Allen</u>, 14 S.E. 685, 686
(N.C. 1892)); <u>see</u> <u>generally</u> 31 C.J.S. Estoppel and Waiver § 125.[30]
The overriding principle is stated best perhaps by the quaint but
apt Scotch law that "a man shall not be allowed . . . to approbate
and reprobate" at the same time.  <u>Silling v. Erwin</u>, 885 F. Supp.
881, 897 (S.D.W.Va. 1995) (quoting <u>Rohanna v. Vazzana</u>, 84 S.E.2d
440, 442 (Va. 1954)).

The Court recognizes that the Supreme Court of Virginia has
held that, in general, estoppel does not apply to local government
entities, including counties, in the discharge of their government
functions.  <u>Bd. of Supervisors of Washington County v. Booher</u>, 352
S.E.2d 319, 321 (Va. 1987); <u>Gwinn v. Alward</u>, 369 S.E.2d 410, 413
(Va. 1988); <u>Segaloff v. City of Newport</u>, 163 S.E.2d 135, 137 (Va.

---

[30] <u>Accord</u> <u>Glus v. Brooklyn Eastern Dist. Terminal</u>, 359 U.S.
295, 234 (1959)(quoting <u>Union Mut. Ins. Co. v. Wilkinson</u>, 80 U.S.
22 (1871)) ("The principle is that where one party has by his
representations or his conduct induced the other party to a
transactions to give him an advantage which it would be against
equity and good conscience for him to assert, he would not in a
court of justice be permitted to avail himself of that
advantage."); <u>Souza v. Westlands Water Dist. et. al.</u>, 135 Cal. App.
4th 879, 895 (Cal. App. 4th 2006) (applying same principle to third
party beneficiaries); <u>Raymundo v. Hammond Clinic Ass'n</u>, 449 N.E.2d
276, 283 (Ind. 1983); <u>Cohen v. Holloways', Inc.</u>, 260 A.2d 573, 409
(Conn. 1969); <u>Watson et. al. v. Woodruff et. al.</u>, 114 P.2d 864,
870 (Kan. 1941) (a principal "can not take the benefits and not
assume the burdens" of a contract made by his agent); <u>Atlantic
Greyhound Lines v. Skinner</u>, 2 S.E.2d 441, 447 (Va. 1939) (free
ticket holder may not be "permitted to enjoy the benefits of the
privilege [of the free ticket], and reject the burdens which were
imposed as an integral part" of the deal).

1968); see Davis v. George Mason Univ., 395 F. Supp. 2d 331, 335
(E.D.Va. 2005).  However, quasi-estoppel is a flexible doctrine
that is applied in many contexts.  Whiteacre, 591 S.E.2d at 882
("quasi-estoppel is inherently flexible and cannot be reduced to
any rigid formulation"); Estate of Lampert Through Thurston v.
Estate of Lampert Through Stauffer, 896 P.2d 214, 221 (Alaska 1995)
("Like any equitable theory, the doctrine offers flexibility:
Estoppel by any name is based primarily on considerations of
justice and fair play . . ..") (internal quotations and citations
omitted).

     While the Court has found no Virginia case stating so, many
State courts have held that, where fairness and justice so require,
a local government entity may be estopped, notwithstanding the
general rule against doing so.  As stated by the Supreme Court of
Nebraska, quoting the Supreme Court of Missouri:

>           'As a usual thing, the doctrine of equitable
>      estoppel cannot be invoked against a municipal
>      or public corporation as to the exercise of
>      governmental functions, but yet exceptions are
>      to be made, and where right and justice demand
>      it, the doctrine will be held to apply . . ..'

City of Grand Island v. Willis, 7 N.W.2d 457, 462 (Neb. 1943)
(citing State v. Haid, 41 S.W.2d 806, 808 (Mo. 1931)); accord
Ranchlands Inc. v. Twp. of Stafford, 702 A.2d 1325, 1330 (N.J. App.
Div. 1997) aff'd, 720 A.2d 339 (N.J. 1998) (holding that local
government entities may be estopped and collecting supporting
cases); Farrell et. al. v. Placer County et. al., 145 P.2d 570,

28

571-72 (Cal. 1944) ("Equity does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention." and collecting California decisions estopping local government entities); Advance-Rumley Thresher Co., 288 F. at 751 (estoppel applies to municipal corporations regarding routine or business engagements) and 752 (estopping Scott County, Arkansas from denying validity of a contract by which the County derived benefits for four years).

The principle underlying these cases is summed up in the language quoted by the Supreme Court of California, and which aptly applies here to the School Board, that "[i]f we say with Mr. Justice Holmes, 'Men must turn square corners when they deal with the Government,' it is hard to see why the government should not be held to a like standard of rectangular rectitude when dealing with its citizens." Farrell, 145 P.2d at 572 (quoting John MacArthur Maguire & Philip Zimet, Hobson's Choice and Similar Practices in Federal Taxation, 48 Harv. L.Rev. 1281, 1299 (1935)).  Here, it would be unjust and unconscionable to allow the School Board to challenge a federal statute and federal and State regulations with which the School Board repeatedly has promised to comply and through which it has repeatedly obtained significant benefits.  For the foregoing reasons, the School Board is estopped from challenging the IDEA under the Spending Clause and thereby avoiding

its past-obligations under those laws.  For the same reasons, it also is estopped from challenging the State regulations.

Ordinarily, that would end the matter because it is preferable not to decide cases on alternative grounds.  Karsten v. Kaiser Found Health Plan of the Middle Atlantic States, Inc., 36 F.3d 8, 11 (4th Cir. 1994).  However, it is permissible to do so in this case because of the nature of the issues presented, the delay suffered already by the parents, and the School Board's refusal to abide by the decision of the Hearing Officer, the IDEA, and federal and State regulations.  See Id. ("from the perspective of judicial economy, alternative holdings are a welcome blessing for courts at all levels.")  By deciding this matter in the alternative, the Court hopes to expedite the litigation process and to conserve the resources of the parties and the judiciary.

## IV. Spending Clause Merits

As stated above, the School Board argues that, if the IDEA is read to require pendente lite payments, the IDEA violates the Spending Clause because, under the precepts set forth in the Fourth Circuit's decision in Riley, 106 F.3d 559, 566-68, the statute does not clearly and unequivocally require pendente lite payments.  See id. at 566-67.  To assess the merits of the School Board's argument, it is necessary to examine the text, purpose, and binding case law interpreting the IDEA.

Congress stated that the purpose of IDEA is:

> to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet the their unique needs and to prepare them for employment and independent living;
>
> to ensure that the rights of children with disabilities and parents of such children are protected; and
>
> to assist States, localities, educational service agencies and Federal agencies to provide for the education of all children with disabilities.

§ 1400(d)(1)(A)-(C). "To accomplish this ambitious objective, the Act provides federal money to State and local education agencies that undertake to implement the substantive and procedural requirements of the Act." Schl. Comm. of the Town of Burlington, Massachusetts v. Dep't of Educ., 471 U.S. 359, 368 (1985).

To receive federal funding under the IDEA, a State must certify to the Secretary of Education that the State complies with the statute's requirements, including the requirement that the State must provide a free appropriate public education for all children ages 3 - 21. § 1412(a)(1)(A). The State, in turn, makes grants to eligible LEAs, which provide education to disabled children. If the LEA does not comply with eligibility requirements, the State may withdraw federal funds from the LEA. § 1413(d)(1).

31

Education pursuant to the IDEA is generally provided through the public schools.  However, if the LEA can not provide the free appropriate education in a public school, it must do so in a private school.  § 1412(a)(10)(C)(ii).  This obligation arises when the LEA agrees to take that course or when a hearing officer (or a court) finds that a free and appropriate education is not made available by the LEA in a timely manner. § 1412(a)(10)(C)(ii).  The foregoing statutory provisions are clear and unambiguous; and, the School Board does not contend otherwise.

"State and local compliance with the IDEA is monitored by federal review, see 34 C.F.R. §§ 104.61, 100.7, and by procedural safeguards extended to handicapped children and their parents." Susquenita Dist. v. Raelee S., 96 F.3d 78, 82 (3d Cir. 1996).  The IDEA sets forth a detailed process for developing and agreeing upon an individualized educational plan.   For an IEP to become effective, both the  school officials and the parents must agree that it is the appropriate plan for the child.  However:

> apparently recognizing that this cooperative approach would not always produce a consensus between the school officials and the parents, and that in any disputes the school officials would have a natural advantage, Congress incorporated an elaborate set of what it labeled 'procedural safeguards' to ensure the full participation of the parents and proper resolution of substantive disagreements.

Burlington, 471 U.S. at 368.  These safeguards are found in § 1415 of the IDEA.   Among the most significant of the procedural

32

safeguards is the right to a due process hearing presided over by a hearing officer and the right to judicial review of the hearing officer's decision. § 1415(f),(i),(k).

However, as the Supreme Court noted in Burlington, "the review process is ponderous," often taking a year or more.  Burlington, 471 U.S. at 370.  That, unfortunately, is an understatement because the losing party has up to a year to file for judicial review of the hearing officer's decision.  While parents are not likely to engage in such a lengthy delay, the LEA would have significant motivation to delay filing an appeal of an adverse decision if the LEA had no obligation to fund the private placement during the year before an appeal has to be filed and during the ensuing appeal. Perhaps the most important procedural safeguard, therefore, is the stay-put provision found in § 1415(j).[31]

In Burlington, the hearing officer decided in favor of parents who had placed their child in a private school, and, thereafter had challenged their child's IEP.  Burlington, 471 U.S. at 372.  The Supreme Court held that the decision of the hearing officer in favor of the parents constituted an agreement for the purposes of

------

[31] That provision reads:

   during the pendency of any proceedings conducted pursuant
   to this section, unless the State or local educational
   agency and the parents otherwise agree, the child shall
   remain in the then-current educational placement of such
   child . . ..

§ 1415(j).

33

§ 1415(j).  Id.[32]  That construction of § 1415(j) is now beyond dispute.

When the IDEA is considered as a whole and in light of the Supreme Court's holding in Burlington respecting what constitutes an agreement, it is clear that once a State Hearing Officer has decided that an IEP is inappropriate and that a private placement is appropriate there is an agreement by the State to that private placement.  Giving § 1415(j) the meaning ascribed to it in Burlington, and considering that section in context of the entire statute, once the State Hearing Officer decides that the proper placement is in a private school, the School Board must bear the cost of that placement, including while the School Board is appealing the State Hearing Officer's decision.  Were that not the case, the child would receive an appropriate education only if the parents could afford to pay for the private school education during the LEA's appeal of an adverse decision.  And, that would obviously not be a free and appropriate education during the pendency of

---

[32] In Burlington, the Supreme Court construed the meaning of § 1415(e)(3) of the Education of the Handicapped Act, which subsequently became § 1415(j) of the IDEA.  In particular, the Court held that:

> as an initial matter, we note that the section calls for the agreement by either the State or the local education agency.  The [hearing officer's] decision in favor of the [parents] and the [private school] placement would seem to constitute agreement by the State to the change of placement.

471 U.S. at 372.

34

judicial review.  If the child's parents could not afford the cost of the appropriate placement, then the child would not receive the appropriate education at all and it would be removed from that placement, notwithstanding that the State (by virtue of a state hearing officers' decision) and the parents have agreed that the private school is the appropriate placement.  Neither result is consistent with the Supreme Court's instruction that because the IDEA "was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives."  Burlington, 471 U.S. at 372.

The Third Circuit has reached the same result reached here. In Susquenita, the Third Circuit, relying upon the IDEA's statutory text, purpose, and legislative history, concluded that the pendent placement provision of § 1415(j) was included in the IDEA to protect disabled children and their parents during the judicial review process.  Susquenita, 96 F.3d at 82 (citing Honig v. Doe, 484 U.S. 305, 323 (1988) and Burlington, 471 U.S. at 373) ("We also note that § 1415(e)(3) [now § 1415(j)] is located in a section detailing procedural safeguards which are largely for the benefit of the parents and the child.").

Susquenita involved a situation quite similar to the one presented by this record.  There, as here, the parents rejected a proposed IEP and placed their child in a private school at their

own expense.   The parents then instituted and won a due process
hearing.   In federal court, the parents argued that the school
district was responsible for the cost of the child's education from
the time the hearing officer had ruled in their favor through the
remainder of the appellate process.

As does the School Board here, the Susquenita school district
took the view that the student's placement before the parents
placed her in the private school was the placement for the duration
of the administrative and judicial proceedings and, for that
reason, the administrative ruling in favor of the parents did not
require the school district to pay for the child's education at the
private school.   The Third Circuit rejected that view, stating
that:

> Accepting this position would contravene the
> language of the statute and the holding in
> Burlington.   Furthermore, it would mean that
> the [administrative] decision in favor of the
> parents is of no practical significance unless
> and until it is affirmed by a decision that
> cannot be or is not appealed.

Susquenita, 96 F.3d at 84.   The Third Circuit then held that:

> It is undisputed that once there is State
> agreement with respect to pendent placement, a
> fortiori, financial responsibility on the part
> of the local school district follows.   Thus,
> from the point of the [state administrative]
> panel decision forward . . . [the] pendent
> placement, by agreement of the state, is the
> private school and Susquenita is obligated to
> pay for that placement.

Id. (emphasis added).

The Susquenita school district also contended that, even if the administrative decision in favor of the parents was construed as an agreement to a new pendent placement that imposed financial responsibility on the school district, that obligation was not immediate (i.e., that it was not in effect pendente lite) and that, because of the decision in Burlington, the parents were obligated to bear the financial burden of the alternate placement until the propriety of the child's educational placement was conclusively established on appeal.  The Third Circuit rejected that argument, holding that:

> we decline to adopt this restrictive reading of the court's holding in Burlington.  We conclude that the school district may be required to pay for tuition and expenses associated with a pendent placement prior to the conclusion of litigation.

Susquenita, 96 F.3d at 84.  As did the Supreme Court in Burlington, the Third Circuit in Susquenita, recognized that delay was inherent in the review process, and that this delay imposed serious financial consequences.

Taking a page from the decision of the Supreme Court in Burlington, the Third Circuit explained that:

> In this case, as in many other cases, where parents who disagree with an IEP proposal for their child wait for the merits of their case to be addressed through the process of administrative and judicial review, they must make a choice.  They may have the child remain in what they believe to be an inappropriate placement or they may elect to pay for what they deem appropriate.  This choice is real

only for parents who have the financial where
with all to pay for alternative placement.
While parents who reject a proposed IEP bear
the initial expense of unilateral placement,
the school district's financial responsibility
should begin when there is an administrative
or judicial decision vindicating the parents'
position.  The <u>purpose of the Act</u>, which is to
ensure that every child receives a '<u>free and
appropriate education</u>' <u>is not advanced by
requiring parents, who have succeeded in
obtaining a ruling that a proposed IEP is
inadequate, to front the funds</u> for continued
private education.

<u>Id.</u> at 87 (emphasis added).  Considering the "free and appropriate

education" requirements of the IDEA, the text of § 1415(j), the

purpose of the statute, and the Supreme Court's decision in

<u>Burlington</u>, the Third Circuit rejected the view urged here by the

School Board for the reason that:

the burden that such an approach would place
on many families is overwhelming.  The cost of
private education, especially in institutions
specializing in teaching the learning
disabled, is substantial.  Families without
means would be hard pressed to pay for private
education in what would almost invariably be
the significant time lapse between a ruling in
their favor and the ultimate close of
litigation. 'The review process is ponderous.'
<u>Burlington</u>, 471 U.S. at 370.  <u>Without interim
financial support, a parent's 'choice' to have
his child remain in what the State has
determined to be an appropriate private school
placement amounts to no choice at all</u>.  The
prospect of reimbursement at the end of the
litigation turnpike is of little consolation
to a parent who cannot pay the toll at the
outset.

<u>Id.</u> at 87 (emphasis added).

Thus, in Susquenita, the Court of Appeals held that the private school placement was the appropriate pendent placement because of the State Hearing Officer's decision; that the school district was required to fund that placement; and that the school district's financial obligations were immediate and could not be deferred until the close of litigation.  In summation, the court explained that "[t]hese requirements are distilled from the unambiguous language of the IDEA, the Act's legislative history and the case law interpreting the Act."  Susquenita, 96 F.3d at 87.[33]

Every court of appeals that has considered whether the IDEA, including § 1415(j), requires a pendente lite payment obligation after a hearing officer has ruled in favor of the parents has reached the same conclusion.  In Clovis Unified School District v. California Office of Administrative Hearings, 903 F.2d 635 (9th Cir. 1990), the Ninth Circuit, citing the holding in Burlington that a decision by the hearing officer in favor of the parents constituted an agreement within the meaning of § 1415(j), affirmed the decision of the lower court and held that "[t]he district was

---

[33] The Court notes that the Third Circuit, in Susquenita, used, as a point of departure for its holding, the portion of the Supreme Court's opinion in Burlington stating that "such relief as the court determines is appropriate," § 1415(i)(2)(B)(iii), includes retroactive reimbursement.  Susquenita, 96 F.3d at 86 (citing Burlington, 471 U.S. at 369-70) (§ 1415(i)(2)(B)(iii) appeared as § 1415(e)(3) in the EHA prior to 1996).  However, in reaching its decision, the Third Circuit also considered the statute as a whole and its legislative history, as well as statutory purpose.  Susquenita, 96 F.3d at 85-87.

responsible for maintaining [the private school] placement through the pendency of court review proceedings." <u>Clovis</u>, 903 F.2d at 641.  For largely for the same reasons, the Second Circuit reached the same result in <u>Board of Education v. Schutz</u>, 290 F.3d 476, 484 (2d Cir. 2002).  <u>See</u> <u>also</u> <u>Mackey v. Bd. of Educ.</u>, 386 F.3d 158, 163 (2d Cir. 2004); <u>Murphy v. Arlington Central Schl. Dist. Bd. of Educ.</u>, 297 F.3d 195, 201 (2d Cir. 2002).[34]  Each of these courts concluded that the school boards involved were required to maintain that placement at the school board's expense pending the school board's appeal of the hearing officer's decision.  And, each court did so based on the plain language of the IDEA, the purpose of the statute, and the decision in <u>Burlington</u>, that a state hearing officer's decision in favor of the parents constituted an agreement to the change in placement within the meaning of § 1415(j).  Significantly, none of those decisions relied upon any regulatory interpretation of the statute by the Department of Education.

Contrary to the School Board's argument, the Fourth Circuit's decision in <u>Wagner v. Board of Education of Montgomery County</u>, 335 F.3d 297 (4th Cir. 2003), does not foreclose this Court from reaching the same outcome as did the Second, Third and Ninth

---

[34] Several district courts have reached the conclusion.  <u>See</u> <u>Escambia County Bd. of Educ. v. Benton</u>, 358 F. Supp. 2d 1112, 1123-24 (S.D. Ala. 2005); <u>Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea</u>, 353 F. Supp. 2d 449, 456-58 (S.D.N.Y. 2005)' <u>W. Platte R-II Sch. Dist. v. Wilson</u>, 2004 U.S. Dist. LEXIS 16889, *8 (D. Mo. 2004); <u>Bd. of Educ. of the Pine Plains Cent. Sch. Dist. v. Engwiller</u>, 170 F. Supp. 2d 410, 414 (S.D.N.Y. 2001).

Circuits.  In <u>Wagner</u>, the Fourth Circuit held that § 1415(j) does not enable a federal district court to change a disabled child's educational placement when the placement provided for by the LEA becomes unavailable through no fault of the LEA.  <u>Id.</u> at 300-01. Explaining its reasoning, the Fourth Circuit wrote:

> Section 1415(j) provides simply and unequivocally that the child "shall remain" in his or her "then-current education placement" "during the pendency of any proceedings conducted pursuant to this section." 20 U.S.C. § 1415(j).  The utility of section 1415(j) is thus easily understood. It guarantees an injunction that prohibits a school board from removing the child from his or her current placement during the pendency of the proceedings. The injunction is automatic; the party seeking it need not meet the usual requirements for obtaining preliminary injunctive relief.

<u>Id.</u> at 301.  Echoing the Supreme Court's statement that § 1415(j) "says nothing about financial responsibility, waiver, or parental right to reimbursement at the conclusion of judicial proceedings," <u>Burlington</u>, 471 U.S. at 372, the Fourth Circuit wrote, "[b]y its terms, section 1415(j) does not impose any affirmative obligations on a school board; rather, it is totally prohibitory in nature." <u>Wagner</u>, 335 F.3d at 301.

It is true that read in isolation § 1415(j) does not specify that a LEA must assume the cost of the appropriate educational placement of the child.  However, it is axiomatic that courts "are obliged to look to the statutory language as a whole, construing each section in harmony with every other part or section, because

41

'[a]ct[s] of Congress . . . should not be read as a series of unrelated and isolated provisions.'" Soliman v. Gonzalez, 419 F.3d 276, 282 (4th Cir. 2005) (quoting Gustafson v. Alloyd Corp., 513 U.S. 561, 570 (1995)). Accordingly, § 1415(j) must be read in harmony with §§ 1412(a),(a)(1)(A) and §§ 1413(a),(a)(1)(A), which respectively require participating States to provide a free and appropriate public education to all children ages 3 through 21, and require LEAs to comply with state laws implementing the IDEA. By prohibiting the removal of a child from the educational placement that both the parents and the State – by way of a state hearing officer's decision in favor of the parents – have agreed is appropriate, § 1415(j) ensures that eligible children receive a free and appropriate education during the often-protracted administrative and judicial review period provided by § 1415.

As the Fourth Circuit has stated, "when presented with an application for section 1415(j) relief, a district court should simply determine the child's then-current educational placement and enter an order maintaining the child in that placement." Wagner, 335 F.3d at 301. In a "typical IDEA case," where a LEA is attempting to remove a disabled child from the public schools, id. at 300, relief will take the form of enjoining the child's removal, thereby requiring the LEA to maintain the cost of the child's public school education. In a case like this one, where the parents' unilaterally place their child in a private school, and

the State ratifies that decision by way of a state hearing
officer's decision, "an order maintaining the child in that
placement" requires that, if the School Board refuses to comply
with its statutory obligations under the IDEA, the district court
must order the LEA to assume the costs of the appropriate placement
pendente lite.

In summary, based on the text and statutory purpose of the
IDEA and the decision of the Supreme Court in Burlington, the IDEA
clearly requires a school district to assume the pendente lite
costs of the private educational placement once a state hearing
officer rules in favor of the parents that the public placement
proposed in the IEP is inappropriate and that the private placement
is appropriate.  This is true notwithstanding that, as Burlington,
Riley, and Wagner observe, § 1415(j) does not explicitly mention
either funding or pendente lite payments.[35]  Rather, this is because

---

[35] The School Board argues that Riley forbids consideration of
Burlington and the decisions of the Second, Third and Ninth
Circuits holding that the IDEA imposes the pendente lite payment
obligation.  It is true that Riley instructs that the clear terms
of conditions must be found in the statute, the purpose of the
statute, and the legislative history.  Riley, 106 F.3d at 568.  As
stated herein, both this decision and those of the cited courts of
appeals rely solely on the text, purpose, and legislative history
of the IDEA.
    Moreover, Riley cannot be read to preclude consideration of
decisions of the Supreme Court or other Courts of Appeals in
construing statutes enacted pursuant to the Spending Clause.
Indeed, the Supreme Court and the Fourth Circuit have employed
those sources, and several others, in construing statutes that
allegedly offend the Spending Clause.  Jackson, 125 S. Ct. at 1501
(reading Title IX in the context of Sullivan v. Little Hunting
Park, 396 U.S. 229 (1969), and holding that related Title IX case

43

the IDEA, when construed as a whole, requires the LEA to provide all disabled children with a free appropriate public education as a condition of accepting federal funding, and because, as interpreted by the Supreme Court in <u>Burlington</u>, the decision of the state hearing officer that an IEP is inappropriate and a private school placement is appropriate is an agreement within the meaning of § 1415(j).

For purposes of the Spending Clause analysis, the Commonwealth, when it accepted the federal funding here at issue,

---

law gave funding recipients notice of liability for discriminatory retaliation); <u>Davis</u>, 526 U.S. at 641-42 (citing related Supreme Court decisions, agency guidelines, and trade association publications as sources of notice to recipients of federal funding that recipients could be held liable for student-on-student harassment); <u>A.W. v. Fairfax County. Schl. Bd.</u>, 372 F.3d 674, 680 (4th Cir. 2004) (citing Supreme Court precedent to interpret the term "educational placement" in § 1415(j)); <u>Wagner v. Bd. of Educ. of Montgomery County.</u>, 335 F.3d 297 (4th Cir. 2003) (citing <u>Honig v. Doe</u>, 484 U.S. 305 (1988), to construe the meaning of § 1415(i)(2)(B)(iii) of the IDEA); <u>Constantine v. Rectors and Visitors of George Mason Univ.</u>, 411 F.3d 474 (4th Cir. 2005) (deciding the case based on its prior decision in <u>Litman v. George Mason Univ.</u>, 186 F.3d 544 (4th Cir. 1999)); <u>Litman</u>, 186 F.3d at 553 (applying the holding in <u>Lane v. Pena</u>, 518 U.S. 187, 198 (1996) to resolve the issue in <u>Litman</u>); <u>Sellers v. Schl. Bd. of the City of Manassas, Virginia</u>, 141 F.3d 524 (4th Cir. 1998)(citing <u>Smith v. Robinson</u>, 468 U.S. 992 (1984), as a source of notice for <u>Pennhurst</u> purposes and holding that states are not subject to § 1983 liability for IDEA violations); <u>see also</u> <u>Blessing v. Freestone</u>, 520 U.S. 329, 343 (1997) (using federal regulations to interpret statute); <u>Suter v. Artist</u>, 503 U.S. 344, 363 (1992) (same); <u>Sch. Bd. of Nassua Cty., Florida v. Arline</u>, 480 U.S. 273, 292 (1987) (same); <u>Bennet v. Kentucky Dept. of Educ.</u>, 470 U.S. 656, 672 (1985) (federal regulations and agency guidelines); <u>Pennhurst</u>, 451 U.S. at 20 (citing legislative history), 21 (floor statements of Senators), 23 (statement by the Secretary of Health and Human Services), 24 (annual appropriations).

was on notice, by virtue of the clear terms of the IDEA as well as the decisions interpreting it, that its LEAs had an obligation to fund a private school placement while the LEA appealed a hearing officer's decision holding that an IEP offered by the LEA was inappropriate and that a private school placement was appropriate. Pennhurst, 451 U.S. at 17.  Indeed, in this case, the Commonwealth does not contend that it was not on notice of the condition at issue.   To the contrary, the Commonwealth acknowledged this condition by imposing, in its own regulations, the obligation that LEAs fund a private placement if a state hearing officer agrees that an IEP does not provide an appropriate education and that the private placement does.  § 8 VAC 80-20-76(O)(3).

Notably, the School Board also does not contend that it was not on notice of this obligation.  Rather, it bases its Spending Clause argument solely on the alleged absence of statutory clarity, and it makes that assertion based upon an unpublished decision issued by this Court,[36] which does not address the Spending Clause at all or the validity of the stay-put provision in § 1415(j).

For the foregoing reasons, the requirements of Pennhurst, its progeny, and Riley are satisfied and the School Board's challenge to the constitutionality of the IDEA is rejected.

---

[36] Prince William County School Board v. Hallums, CA No. 02-1005-A, Mem. Op., Aug. 12, 2003.

**V.    The School Board's Other Arguments**

The School Board also seeks summary judgment on the theories
that: (1) the regulation, 34 C.F.R. § 300.514(c), contradicts the
provisions of § 1415(j); (2) 34 C.F.R. § 300.514(c) is invalid
because it exceeds the authority of the Department of Education
under § 1415(j); (3) the regulation should not be enforced because
it contradicts other provisions of the IDEA and is bad public
policy;[37] and (4) the reauthorization of the IDEA in 2004 limited
the authority of the Department of Education in promulgating new
special education regulations.   Given the resolution of the
Spending Clause issue and the finding in connection therewith that
the statute at issue speaks clearly and unambiguously as to the
obligations of the School Board, it is unnecessary to consider any
of those four arguments because each is founded on the notion that

---

[37] It is not the office of courts to make policy.  That
responsibility is vested in the executive and legislative branches.
The executive branch has made clear its view respecting the
pendente lite obligations. Burlington was decided in 1985,
Susquenita in 1996, Clovis in 1990 and Schutz in 2002.  The United
States Secretary of Education promulgated 34 C.F.R. 300.514(c) in
March 1999.  Congress, which is presumed to know the law, Cannon v.
Univ. of Chicago, 441 U.S. 677, 696097 (1979), has met many times
since the cited decisions were issued and the regulations were
promulgated; and, while it has amended the IDEA in response to
other court decisions, it has not amended the IDEA to reverse
Burlington, Susquenita, Clovis, or the other related decisions of
the courts of appeals.   See Brf. of the United States as Amicus
Curiae in Response to School Board's Sec. Mot. for Part'l Summ.
Judgment (Docket No. 48) at 11-12, n. 9-12 (noting that Congress
has amended the IDEA four times since the Supreme Court decided
Burlington.)  Thus, if the pendente lite obligation is bad policy,
it is for Congress, not the courts, to decide so and enact a
statute reflecting a different policy.

the IDEA does not require _pendente_ _lite_ payments.  Hence, those alternate arguments will not be considered further.

For the foregoing reasons, the School Board's partial motion for summary judgment on Count I of the parents' Counterclaim (and, to the extent sought, on its own complaint) is denied.[38]

## VI.  The Parents' Counterclaim

### A.  Count I: The Federal "Stay-Put" Requirements

For the reasons that the School Board's motion for partial summary judgment is rejected, the parents are entitled to summary judgment on Count I of their Counterclaim.

### B.  Count II:  The State "Stay-Put" Regulation

In Count II of their Counterclaim and in their Motion for Summary Judgment,[39] the parents seek relief under the Virginia stay-put regulations.  8 VAC §§ 80-20-76(E)(1),(3),(O)(3).  In the School Board's Second Motion for Partial Summary Judgment, the School Board seeks summary judgment in its favor on Count II of the parents' counterclaim.

The IDEA permits States to enact special education laws and standards that provide greater protections than those required by

---

[38] The School Board's motion does not make clear on what it seeks summary judgment.  But, considering the text, it appears that the motion is directed to Counts I and II of the parents' Counterclaim.

[39] Counterclaim Plaintiffs' Motion for Summary Judgment on Counterclaim Counts I and II (Docket No. 28).

federal law.  § 1401(9)(B).  Virginia law permits the State Board
of Education to prescribe due process procedures for resolving
disputes respecting "program placements, individualized education
programs, tuition eligibility and other matters as defined in state
or federal statutes or regulations . . .."  Va. Code Ann. § 22.1-
214(A), (B).  Acting pursuant to that statute, the Virginia Board
of Education adopted regulations implementing a State version of
the "stay-put" rights.  Those regulations provide that:

> if the decision of a hearing officer agrees
> with the child's parent or parents that a
> change of placement is appropriate, that
> placement <u>shall be treated as an agreement
> between the local educational agency and the
> parent or parents for the purpose of
> maintaining the child's placement during the
> pendency of any administrative or judicial
> appeal proceeding</u>.

8 VAC 20-80-76 (E)(3) (emphasis added).  The regulations also
provide that, "if the hearing officer decides in the parents'
favor, and that decision is appealed in court," "the hearing
officer's order <u>must be implemented while the case is being
appealed</u>."  8 VAC 20-80-76 (O)(3) (emphasis added).  In RT's case,
the State Hearing Officer agreed with the parents that the change
of placement was appropriate.  Accordingly, under the applicable
State regulations, the placement at the Faison School must be
treated as an agreement between the School Board and the parents
"for the purposes of maintaining the child's placement during the
pendency of any administrative or judicial appeal proceeding."  8

48

VAC 20-80-76 (E)(3).  Moreover, because RT's case satisfies the circumstances described in section (O)(3), the State Hearing Officer's decision must be implemented while the case is being appealed by virtue of that section.

The School Board initially sought judgment in its favor on Count II of the Counterclaim by asserting that the Virginia Department of Education only promulgated the state regulations at issue because the United States Department of Education had promulgated 34 C.F.R. § 300.514(c) in 1999, and that recently the State Department of Education, acting on the strength of a staff member's letter and counsel's advice, had instructed the School Board that the State Department of Education could not compel the payment of the tuition under the stay-put provision of the state regulations.  To support this position, the School Board relied on the affidavit of Dr. Judith Douglas,[40] a member of the staff of the State Department of Education.

As briefing progressed in this case, and as the position of the School Board and the existence of Dr. Douglas' affidavit became known in the State and federal departments of education,[41] it became obvious that Dr. Douglas' affidavit was neither authorized by, nor was the position of, the State Department of Education.  To the

---

[40] Filed July 8, 2005 as an attachment to the Schl. Bd.'s Mem. in Support of its Second Mot. for Part'l Summ. J. (Docket No. 32).

[41] See Hager Letter (Attached as an Exh. to Docket No. 48), supra, note 22.

contrary, the record clarified that, whatever interim positions the
staff of the State Department of Education had taken based on their
strained interpretation of the <u>Hallums</u> decision, the official
position of the State Department of Education is that 8 VAC 20-80-
76(E)(3) is valid and is being enforced by the State Department of
Education.[42]  Consequently, the position of the School Board based
on the staff's interim deliberations are not meritorious.[43]

At the end of a protracted briefing process, in response to an
amicus brief, the School Board floated for the first time the
tersely presented argument that the First Circuit's opinion in <u>Town
of Burlington v. Deptartment of Education</u>, 736 F.2d 773 (1st Cir.
1984) precluded enforcement of the State regulations.  The School
Board's argument was that the doctrine of "cooperative federalism,"

---

[42] Letter of Jo Lynne DeMary to John H. Hager, Sept. 9, 2005
and Letter of H. Douglas Cox, Secretary of the Virginia Department
of Education, to Frederick S. Morton, IV, Division Superintendent,
Henrico Count Public Schools, Sept. 30, 2005 (attached as Supp.
Exhs. to the Reply Mem. of Law of Amicus Curiae, The Commonwealth
of Virginia, Virginia Office for Protection and Advocacy) (Docket
No. 55); Statement of Deborah Love, Senior Assistant Attorney
General, Commonwealth of Virginia, at the hearing of October 13,
2005 in this matter, Tr. p. 3 - 6, attached as Exh. B to School
Board's Brief Regarding Spending Clause Issues (Docket No. 68).

[43] It appears that the staff of the State Department of
Education and a lawyer in the Virginia Attorney General's Office
reached the view that the decision in <u>Hallums</u> had the effect of
invalidating the state regulation as well as the federal stay-put
statute.  As explained previously, the decision in <u>Hallums</u> did not
address the validity of the federal stay-put provision or the
Virginia stay-put regulation.

as discussed in the First Circuit's opinion, foreclosed a claim under the State regulations.

In essence, that argument is a belated motion to dismiss under Fed. R. Civ. P. 12(b)(6) to which the defendants had no opportunity to respond.  It can be rejected for that reason alone.[44]

In any event, the decision of the First Circuit in Burlington does not support the view that, in a case validly presenting a federal claim under the IDEA, parents cannot also make a pendent state law claim based on State regulations enacted pursuant to the IDEA and implementing its purposes.

Moreover, where, as here, a federal statute permits a State to impose regulations more stringent than the parallel federal regulations and also provides a private right of action in the federal courts, it is neither reasonable nor rationale to require an aggrieved party to institute parallel actions in state and federal courts:  one to prosecute a federal claim and another to pursue a state claim of the same ilk and based on the same record. That would be a waste of judicial resources and the resources of the parties.  Nothing in the IDEA requires such a duplicative consequence and no principle of federalism dictates such a wasteful and unfair result.  Thus, even if the parents' federal claim had

---

[44] Indeed, this strategy (the belated presentation of inadequately discussed arguments) has been the hallmark of the School Board's approach to litigating this case.  The personal and substantive unfairness of that approach also counsels rejecting it.

been rejected, they would be entitled to proceed in this court, under 28 U.S.C. § 1367 on the claim based on State law.  Nothing in 28 U.S.C. § 1367 requires the Court to decline jurisdiction, and this is particularly so given that this Court has reviewed the entire record and issued a decision on the merits of the State Hearing Officer's decision.

Finally, the issue presented here is unlike the issue which was involved in the First Court's decision in Burlington.  There, the question to be decided pertained to substantive educational requirements governed by a murky state law.  Here, the State law is clear.  Thus, the reasons animating the First Circuit's decision in Burlington are not present in this case.

For the foregoing reasons, the State regulations are in full force and effect and, by their clear terms, the School Board is obligated to fund the Faison placement for RT during the period of judicial review of the State Hearing Officer's decision.

## CONCLUSION

For the foregoing reasons, the School Board's Second Motion for Partial Summary Judgment (Docket No. 31) will be denied, the Counterclaim Plaintiffs' Motion for Summary Judgment on Counterclaims I and II (Docket No. 28) will be granted, and the School Board will be required to satisfy its obligations under the IDEA  and under applicable Virginia regulations by paying the cost of RT's educational placement from December 29, 2003 until March

52

20, 2006, the date when a new IEP, agreed to by the parents and the
School Board, took effect.  Appropriate orders will be issued.

The Clerk of the Court is directed to send a copy of this
Memorandum Opinion to all counsel of record.

It is so ORDERED.


_____/s/_____
Robert E. Payne
United States District Judge


Richmond, Virginia
Date: June 14, 2006